UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

RHODE ISLAND PUBLIC INTEREST RESEARCH GROUP, TOXICS ACTION CENTER, and SIERRA CLUB,

Plaintiffs,

Civil No. CA 05 363 T

v.

**COMPLAINT**

BRADFORD DYEING ASSOCIATION, INC.,

Defendant.

---

## NATURE OF THE CASE

1. This is a suit to enforce (a) the Clean Air Act, brought under Section 304 of the Clean Air Act ("CAA"), 42 U.S.C. § 7604, and (b) the Clean Water Act, brought under Section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365.

2. Defendant Bradford Dyeing Association, Inc. ("BDA") is a Rhode Island corporation operating a textile finishing mill located in Westerly, Rhode Island. BDA releases into the environment a variety of pollutants, including toxic pollutants, in violation of both the CAA and CWA. BDA's violations pose a threat to both public health and the environment.

## JURISDICTION, VENUE, AND NOTICE

3. Subject matter jurisdiction is conferred upon this Court by Section 304(a)(1) of the CAA, 42 U.S.C. § 7604(a)(1), and Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), the "citizen suit" provisions of the CAA and the CWA, respectively, and by 28 U.S.C. § 1331.

4. Pursuant to Section 304(c)(1) of the CAA, 42 U.S.C. § 7604(c)(1), venue lies in this District because BDA is a stationary source located within this District. Pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), venue lies in this District because BDA is a discharge source located within this District.

5. Pursuant to Section 304(b) of the CAA, 42 U.S.C. § 7604(b), and Section 505(b) of the CWA, 33 U.S.C. § 1365(b), Plaintiffs gave notice of the violations alleged in this Complaint more than 60 days prior to commencement of this lawsuit to: (a) BDA, (b) the United States Environmental Protection Agency ("EPA"), (c) the State of Rhode Island Department of Environmental Management ("DEM"), and (d) the Governor of Rhode Island. Notice was provided by a letter addressed to BDA President Michael R. Grills, dated June 20, 2005 (the "Notice Letter"), with copies sent to EPA, DEM and the Governor. A copy of the Notice Letter is attached to this complaint as Exhibit A.

**PARTIES**

6. Defendant BDA prints, dyes, and coats fabrics for the United States military, overseas governments, and commercial use. BDA's operations are housed in a mill that has an area of approximately 11 acres and is located approximately seven miles east of downtown Westerly. BDA's mill is located in the area of Westerly known as Bradford, in what the company describes as a "residential/mildly-developed area."

7. BDA emits approximately one million pounds of pollutants into the air each year. BDA's air emissions include hazardous air pollutants and volatile organic compounds. Among the pollutants that BDA discharges are particulate matter, glycol ethers, formaldehyde, acetic acid, acetone, mineral spirits, lead, nickel, antimony, cobalt,

beryllium, isopropyl alcohol, ammonia, sulfur dioxide, carbon monoxide, and nitric oxide.

8. Washington County, in which BDA is located, does not meet federal air quality standards for ozone. Volatile organic compounds and nitric oxide, which are among the air pollutants emitted by BDA, can contribute to the creation of ozone.

9. BDA discharges approximately 275 million gallons of wastewater into the Pawcatuck River each year, an average of roughly three-quarters of a million gallons per day.

10. A 5.25-mile segment of the Pawcatuck River, extending from the BDA wastewater discharge point downstream to the Route 3 bridge crossing, is on the State of Rhode Island List of Impaired Waters (a list created under the mandate of CWA Section 303(d), 33 U.S.C. § 1313(d)), because that segment of the river does not meet water quality standards due to adverse biodiversity impacts. Some of the pollutants discharged to the river by BDA can have adverse effects on fish and other aquatic life.

11. Plaintiff Rhode Island Public Interest Research Group ("RIPIRG") is a Rhode Island corporation. It is a non-profit, non-partisan, public interest advocacy organization that advocates for clean air and clean water, among other issues, on behalf of more than 3,000 citizen members from across the state of Rhode Island. RIPIRG researches and distributes analytical reports on environmental issues, advocates before legislative and administrative bodies, conducts door-to-door public education and membership recruitment drives, and pursues public interest litigation on behalf of its members.

12. Plaintiff Toxics Action Center ("TAC") is a Massachusetts corporation. It is a non-profit, non-partisan organization that helps its members and other citizens in Rhode

Island and across New England organize to prevent and clean up toxic pollution in their communities. TAC has worked on a variety of matters related to air and water pollution, including air pollution from New England power plants, pesticides in surface waters and groundwater, and leaking industrial landfills, and is working with Rhode Island residents who are adversely affected by the pollution from the BDA facility.

13. Plaintiff Sierra Club, a California non-profit corporation with an office in Providence, is the nation's oldest and largest conservation organization, with approximately 700,000 members nationwide. The Rhode Island chapter of Sierra Club has approximately 3,000 members who are dedicated to exploring, enjoying, and protecting the state's natural resources and wild places. In addition to organizing nature outings and public education campaigns, Sierra Club and its Rhode Island members pursue advocacy and litigation on issues including clean air and clean water, solid waste reduction, sustainable transportation and land use policies, and efforts to reduce the discharge of mercury into the environment.

14. RIPIRG, TAC and Sierra Club (collectively, the "Plaintiff Groups") each has members who live or own homes near BDA. Each Plaintiff Group has members who are adversely affected by BDA's illegal air emissions and wastewater discharges.

## COUNT I

## BACKROUND ON CITIZEN SUITS UNDER THE CLEAN AIR ACT

15. Under the citizen suit provision of the Clean Air Act, citizens are authorized to enforce state regulations that are part of a State Implementation Plan ("SIP") in federal court. A SIP is a set of state laws and regulations designed to protect air quality. SIPs

are required by the Clean Air Act, in 42 U.S.C. § 7410, and must be approved by EPA. Rhode Island has an EPA-approved SIP.

16. Under the citizen suit provision of the CAA, citizens are also authorized to enforce terms of an operating permit issued under Title V of the CAA (commonly called a "Title V permit").

17. BDA has a Title V permit, Number RI-12-01. BDA's Title V permit states: "All terms and conditions of the permit are enforceable by EPA and citizens under the federal Clean Air Act, 42 US.C. 7401, et seq., unless specifically designated as not federally enforceable." No terms or conditions in BDA's Title V permit are specifically designated as not federally enforceable.

18. The citizen suit provision of the CAA grants jurisdiction to United States District Courts to impose an injunction requiring compliance with the CAA, to impose appropriate civil penalties for violations of the CAA, and to award costs of litigation (including reasonable attorney and expert witness fees).

## BDA'S ODOR EMISSIONS

19. BDA emits air pollutants that create odors so powerful and objectionable that Bradford residents, including members of the Plaintiff Groups, are forced out of their yards to the indoors, and are forced to close their windows when they are indoors. Powerful odors from the BDA factory have forced visitors to Bradford (including out of state visitors and tradespeople working in area homes) to leave the area near the plant altogether.

20. Such odors from the plant can last for hours at a time.

21. There are several distinctive odors emitted from the BDA plant to which local residents object. These include, among others, odors they describe as: a strong chemical smell, likened to burning plastic; a powerful, sickly-sweet, vinegary smell; and a strong rotten egg smell.

22. Bradford residents, including members of the Plaintiff Groups, know that these objectionable odors are generated by BDA. The odors are most noticeable when one is downwind of the factory. The odors are sometimes associated with visible emissions of smoke or steam from the factory building, or with the noise created by certain operations inside the factory. There are no other local sources of such powerful odors.

23. BDA acknowledges that it is the source of odors and odor complaints. A DEM report of an October 22, 2004 DEM inspection of the BDA plant states:

> The ongoing odor and opacity complaints were discussed with Mr. Gibbons and Mr. Souza [BDA personnel]. They stated that they were aware of the problem. Mr. Gibbons produced a logbook noting incidents of odor complaints and in-house responses to self-detected odors. Additionally, Mr. Gibbons stated that he, as well as other Bradford personnel, routinely performed odor checks in the area of the Bradford facility and that when an objectionable odor was noted Bradford attempted to isolate and eliminate the source.

24. The odor emissions from BDA cause members of the Plaintiff Groups to be concerned for their own health and safety, and to be concerned for the health and safety of their families. The odor emissions from BDA have been foul enough to make people, including Plaintiff Group members, gag, cough, experience headaches and burning eyes, feel thirsty, feel like they have something in their throat, and feel a shortness of breath or heaviness in their lungs.

25. The odor emissions from BDA also make members of the Plaintiff Groups concerned that air pollution from BDA diminishes the value of their property.

26. Neighbors of BDA, including Plaintiff Group members, regularly complain about the odors emitted by BDA and often contact DEM with these complaints. DEM has a record of many of these complaints.

27. DEM records show that citizens have formally complained about powerful, objectionable odors from BDA on more than 100 days during the previous five years. The statute of limitations period for Clean Air Act claims is five years preceding the date of the Notice Letter.

## BDA'S AIR POLLUTION VIOLATIONS:
## AIR EMISSIONS DETRIMENTAL TO PERSON OR PROPERTY

28. Rhode Island air pollution control regulations and BDA's Title V permit both contain provisions restricting air emissions that are detrimental to people and property.

29. Rhode Island Air Pollution Control Regulation No. 7 ("Regulation No. 7") provides:

> 7. Emission of Air Contaminants Detrimental to Person or Property
>
> No person shall emit any contaminant which either alone or in connection with other emissions, by reason of their concentration and duration, may be injurious to human, plant or animal life, or cause damage to property or which unreasonably interferes with the enjoyment of life and property.

30. Regulation No. 7 is part of the Rhode Island SIP. A violation of Regulation No. 7 is a violation of the SIP.

31. General Condition P of BDA's Title V permit provides:

> No person shall emit any contaminant which either alone or in connection with other emissions, by reason of their concentration or duration, may be injurious to human, plant or animal life, or cause damage to property or which unreasonably interferes with the enjoyment of life and property.

32. BDA has repeatedly and frequently, over a period of years, emitted contaminants creating odors which, by reason of their concentration and duration, were injurious to human life and unreasonably interfered with the enjoyment of Plaintiff Group members' life and property (see paragraphs 19 through 27).

33. BDA admits it detects objectionable odors despite purported attempts to fix the odor problems (see paragraph 23).

34. With these emissions, BDA violates Regulation No. 7, the Rhode Island SIP, and General Condition P of BDA's Title V permit.

35. Such odor emissions have continued after the Notice Letter was sent. The Plaintiff Groups are unaware of any recent change to BDA's operations that would prevent such odor emissions from continuing.

36. On May 9, 2005, a fire broke out at BDA at around 2:00 a.m.

37. The fire caused a significant amount of smoke to billow from the plant.

38. As a precautionary measure, approximately 200 people living within a half-mile radius of the plant were awakened by the police and evacuated as a result of the fire.

39. The fire, smoke, and resulting evacuation alarmed residents, including Plaintiff Group members, who feared that breathing the smoke would be harmful.

40. The emissions from the fire violated Regulation No. 7 and General Condition P of BDA's Title V permit.

41. Upon information and belief, BDA will continue to violate Regulation No. 7 and General Condition P after the date this Complaint is filed.

**COUNT II**

42. Plaintiffs incorporate paragraphs 1 through 41 as if set forth herein in full.

## BDA'S AIR POLLUTION VIOLATIONS: OBJECTIONABLE ODORS BEYOND THE PROPERTY LINE

43. Rhode Island air pollution control regulations and BDA's Title V permit both contain provisions restricting air emissions that create objectionable odors beyond the company's property line.

44. Rhode Island Air Pollution Control Regulation Number 17 ("Regulation No. 17") provides:

> 17. Odors
>
> 17.1 Prohibitions
> No person shall emit or cause to be emitted into the atmosphere any air contaminant or combination of air contaminants which creates an objectionable odor beyond the property line of said person.
>
> 17.2 Odor Evaluations
> A staff member of the Division of Air Resources shall determine by personal observation if an odor is objectionable, taking into account its nature, concentration, location, duration and source.

45. Regulation No. 17 is part of the Rhode Island SIP. A violation of Regulation No. 17 is a violation of the SIP.

46. General Condition Q of BDA's Title V permit provides:

> Odors
>
> 1. The permittee shall not emit or cause to be emitted into the atmosphere any air contaminant or combination of air contaminants which creates an objectionable odor beyond the property line of this facility.
>
> 2. A staff member of the Division of Air Resources shall determine by personal observation if an odor is objectionable, taking into account its nature, concentration, location, duration and source.

47. Staff in DEM's Office of Air Resources have determined by personal observation that, on the following dates, BDA emitted air contaminants that created objectionable odors beyond the plant's property line: February 10, 2004; November 17,

October 6, September 30, March 27, and January 1, 2003. Each such incident violated Regulation No. 17 and the Rhode Island SIP, and General Condition Q of BDA's Title V permit.

48. DEM has received many citizen complaints about objectionable odor emissions coming from BDA.

49. Because DEM staff have not responded to all of these complaints with a follow-up visit to BDA in a timely fashion, DEM is not in a position to determine whether objectionable odors beyond the company's property line were in fact created at the time each of the complaints was made.

50. Citizens have complained frequently and consistently about BDA's objectionable odor emissions beyond the plant's property line for years (see paragraphs 19 through 27). These complaints have continued after the Notice Letter was received by BDA.

51. BDA admits that it detects objectionable odors despite purported attempts to fix odor problems (see paragraph 23).

52. The Plaintiff Groups are unaware of any recent change to BDA's operations that would prevent such objectionable odors from continuing. Upon information and belief, BDA will continue to create objectionable odors beyond the plant's property line after the date this Complaint is filed, and timely inspections by the DEM Division of Air Resources staff members will find that objectionable odors are created.

53. Plaintiff Group members are adversely affected by the odors created by BDA that violate Regulation No. 17 and General Condition Q, as described in paragraphs 19 through 27.

**COUNT III**

54. Plaintiffs incorporate paragraphs 1 through 53 as if set forth herein in full.

**BDA'S AIR POLLUTION VIOLATIONS: OPACITY**

55. Under the CAA and the Rhode Island SIP, "opacity" is a measurement of the thickness or density of smoke. Opacity measurements reflect the concentration of particulate matter in air emissions. The higher the opacity level – that is, the more that visible light is blocked – the more particulate matter is being emitted. Opacity levels are recorded on a scale ranging from 0% (no obstruction of light at all) to 100% (smoke that completely blocks the passage of light).

56. BDA burns oil, natural gas, and other substances, resulting in the emission of particulate matter into the atmosphere.

57. Rhode Island Air Pollution Control Regulation No. 1 ("Regulation No. 1") provides:

> 1.2 Limitations
>
> No person shall emit into the atmosphere from any source any air contaminant for a period or periods aggregating more than three minutes in any one hour which is greater than or equal to 20 percent opacity.

58. Regulation No. 1 is part of the Rhode Island SIP. A violation of Regulation No. 1 is a violation of the SIP.

59. General Condition R of BDA's Title V permit provides:

> Visible Emissions
>
> 1. Except as may be specified in other provisions of this permit, the permittee shall not emit into the atmosphere, from any emission unit, any air contaminant, for a period or periods aggregating more than three minutes in any one hour which is greater than or equal to 20 percent opacity. Where the presence of uncombined water is the only reason for failure to meet this requirement, such failure shall not be a violation of this permit.

60. On a number of occasions, BDA's air emissions from the plant had an average opacity of greater than or equal to 20 percent for periods aggregating more than three minutes in any one hour, as determined by compliance observations performed by qualified observers in accordance with federal regulations (40 C.F.R. Part 60, Appendix A, Method 9) ("Method 9 observations").

61. On each of the following dates, Division of Air Resources staff determined that air emissions from BDA's plant exceeded 20 percent average opacity for more than three minutes at a time, in violation of BDA's opacity limits:

| Date | PercentOpacity | Duration |
|---|---|---|
| 2/10/04 | 30 – 50 % | 10 mins. |
| 9/30/03 | 30 – 60 % | 15 mins. |
| 3/14/03 | 30 – 60 % | 10 mins. |
| 1/14/03 | unavailable | unavailable |

Measured opacity in each of the first three incidents listed was never below 30 percent for the entire duration of the observations.

62. Each of these incidents violated Regulation No. 1 and the Rhode Island SIP, and General Condition R of BDA's Title V permit.

63. In addition, on more than one occasion a DEM inspector reported seeing air emissions from BDA's plant having greater than 20 per cent opacity but reported that conditions, such as wind direction and sun angle, prevented the inspector from conducting a Method 9 observation.

64. DEM staff perform Method 9 observations to measure the opacity of BDA's emissions extremely rarely, relative to the amount of time BDA operates.

65. DEM staff cannot perform Method 9 observations at night, per the requirements of EPA Method 9.

66. Plaintiff Group members who live near BDA frequently see dense gray or black smoke emitted from BDA for periods lasting much longer than three minutes. Members have seen smoke plumes extending significant distances from the plant.

67. Plaintiff Group members have made numerous complaints to DEM about emissions of smoke from the BDA factory.

68. Very fine particulate matter, such as that emitted by BDA, can cause respiratory problems when inhaled.

69. Plaintiff Group members are adversely affected by BDA's opacity violations. Plaintiff Group members want as little particulate matter emitted into their neighborhood and the air they breathe as possible, for both health and aesthetic reasons.

70. The Plaintiff Groups are unaware of any recent change to BDA's operations that would prevent opacity violations from continuing. Upon information and belief, BDA will continue to violate its opacity limits after the date this Complaint is filed, and timely opacity observations by DEM staff or other credible evidence will confirm such violations.

**COUNT IV**

71. Plaintiffs incorporate paragraphs 1 through 70 as if set forth herein in full.

**BACKGROUND ON CITIZEN SUITS UNDER THE CLEAN WATER ACT**

72. Dischargers of industrial wastewater must comply with permits issued under the National Pollutant Discharge Elimination System ("NPDES"), a federal program established in Section 402 of the Clean Water Act, 33 U.S.C. § 1342. In Rhode Island, NPDES is administered by DEM as the Rhode Island Pollutant Discharge Elimination System ("RIPDES"), subject to the oversight and ultimate authority of EPA. A RIPDES

wastewater discharge permit, which is required by federal law to meet certain federal criteria, contains limits on the discharge of allowable pollutants, and contains pollutant monitoring requirements. The discharge of any pollutant in violation of a RIPDES permit is prohibited under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

73. BDA has a RIPDES permit, Number RI0000043.

74. Under Section 505 of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen may commence an enforcement action against any person who violates an "effluent standard or limitation" under the CWA. A violation of an "effluent standard or limitation" includes an unlawful act under Section 301(a) of the CWA, and any violation of a NPDES (in this case, a RIPDES) permit condition.

75. The citizen suit provision of the CWA grants jurisdiction to United States District Courts to impose an injunction requiring compliance with the CWA, to impose any appropriate civil penalties for violations of the CWA, and to award costs of litigation (including reasonable attorney and expert witness fees).

76. BDA is required by its RIPDES permit to monitor its wastewater effluent, and to submit the monitoring results to DEM monthly, on forms called "discharge monitoring reports" ("DMRs"). DMRs are signed by a company official under the penalty of perjury. Under the CWA, DMRs are publicly available.

77. The discharge monitoring reports BDA has submitted to DEM are conclusive evidence of the violations reported in those DMRs.

## BDA'S COPPER VIOLATIONS

78. Copper can be so harmful to aquatic life and the environment that EPA has designated copper as a "toxic pollutant" under the Clean Water Act.

79. From November 10, 1991 until July 30, 2003, BDA's RIPDES permit prohibited BDA from discharging wastewater containing copper in concentrations that exceeded 36 micrograms of copper per liter of wastewater: (1) on any given day (called a "maximum daily" or "daily max." limit), and (2) as a per day average over the course of a month (called a "monthly average" limit).

80. During the period beginning June 20, 2000 (the statute of limitations period for Clean Water Act claims is five years preceding the date of the Notice Letter) and ending July 30, 2003, BDA regularly violated both the maximum daily and monthly average copper limits in its permit.

81. Beginning on July 31, 2003, BDA's RIPDES permit set a maximum daily copper concentration limit of 15.1 micrograms of copper per liter of wastewater, and a monthly average copper concentration limit of 3.6 micrograms of copper per liter of wastewater. With respect to the monthly average limit, BDA's RIPDES permit states that "compliance/noncompliance determinations" will be based on whether copper concentrations exceed 5.0 micrograms of copper per liter of wastewater (because DEM believes that the testing methods for copper in wastewater may not reliably report the precise concentration of copper below this level).

82. Beginning in August 2003, BDA has regularly exceeded both the new maximum daily copper limit and the new monthly average copper limit. All of these reported exceedances were above 5.0 micrograms per liter.

83. The copper limits in BDA's permit are water quality-based limits. As required by the CWA, BDA's copper limits were set by DEM at a level designed to achieve compliance with state water quality standards for the Pawcatuck River.

84. Each time BDA exceeds the copper limits in its RIPDES permit, it violates the CWA.

85. BDA does not operate in a manner that allows the company to achieve regular compliance with its daily maximum or monthly average copper limits. Through June 2005 (the latest month for which data are publicly available on BDA's copper violations), BDA had violated at least one of its copper limits in each of 23 consecutive months. In the five years preceding the Notice Letter, BDA violated its copper limits one or more times in 45 of the 60 months for which there is publicly available data.

86. The Plaintiff Groups are unaware of any change to BDA's operations which would enable it to comply with its effluent limits for copper. Upon information and belief, BDA will continue to violate its daily maximum and monthly average copper limits after the date this Complaint is filed.

87. DEM has entered into consent agreements with BDA in which DEM agreed not to enforce the copper limits in BDA's permit.

**COUNT V**

88. Plaintiffs incorporate paragraphs 1 through 87 as if set forth herein in full.

**BDA'S WHOLE EFFLUENT TOXICITY VIOLATIONS**

89. "Whole effluent toxicity" ("WET") is a term used to describe the aggregate toxic effect of an aqueous sample, such as industrial wastewater, as measured by a test organism's response upon exposure to the sample. WET tests can measure acute toxic effects, or lethality, as well as chronic toxic effects, such as impaired growth or reproduction.

90. Whole effluent toxicity limits in NPDES permits are designed to control the impact and toxicity of effluent discharges. Organisms used in WET tests – such as *ceriodaphnia dubia* (freshwater flea) and *pimephales promelas* (fathead minnow) – are indicators or surrogates for the aquatic community to be protected, and a measure of the real biological impact of exposure to toxic pollutants in wastewater.

91. One type of acute WET test measures "$LC_{50}$," which is defined as the concentration of wastewater that causes mortality to 50% of the test organisms.

92. One of the acute whole effluent toxicity limits in BDA's RIPDES permit requires that the $LC_{50}$ concentration for the company's wastewater be no less than 100% for the test organism *ceriodaphnia dubia.* That is, at least half of the test organisms must be able to survive in undiluted, 100% strength effluent for BDA to comply with this effluent limitation. BDA's permit requires that this test be performed quarterly (once every three months) on BDA's wastewater.

93. BDA cannot comply with this permit limit. BDA's wastewater effluent must typically be diluted to approximately 35% strength in order for it to kill no more than half of the test organisms.

94. Beginning in September 2003, BDA has continuously exceeded the permit limit based on the acute WET test using *ceriodaphnia dubia.* Each time BDA exceeds this limit, it violates the CWA.

95. The Plaintiff Groups are unaware of any change to BDA's operations which would enable it to comply with the acute whole effluent toxicity limit that uses *ceriodaphnia dubia* as the test organism. Upon information and belief, BDA will violate this WET limit after the date this Complaint is filed.

96. DEM has entered into a consent agreement with BDA in which DEM agreed not to enforce the whole effluent toxicity limits in BDA's permit.

**COUNT VI**

97. Plaintiffs incorporate paragraphs 1 through 96 as if set forth herein in full.

**BDA'S FECAL COLIFORM VIOLATIONS**

98. In BDA's RIPDES permit, DEM requires the company to test its wastewater for the presence of fecal coliform bacteria.

99. Fecal coliform is a type of bacterium prevalent in the intestines of warm-blooded animals, including humans, and is associated with fecal contamination. Fecal coliform is measured because it is an indicator that fecal contamination may have occurred and that pathogens (disease-carrying agents) may be present.

100. In monitoring its wastewater for fecal coliform under it RIPDES permit, BDA calculates the "most probable number" ("MPN") of fecal coliform colonies in a sample of its wastewater. BDA's RIPDES permit sets the following maximum limits on fecal coliform, calculated as an MPN: 200 colonies per 100 milliliters of wastewater calculated as a per day average over the course of a month (a "monthly average" limit); 400 colonies per 100 milliliters of wastewater calculated as a per day average over the course of a week (a "weekly average" limit); and 400 colonies per 100 milliliters of wastewater on any given day (a "daily maximum" limit).

101. During the five years preceding the Notice Letter, BDA has regularly exceeded its monthly average, weekly average, and daily maximum fecal coliform limits. Each time BDA exceeds these limits, it violates the CWA.

102. BDA's weekly average and daily maximum fecal coliform counts have been as high as 24 million.

103. Plaintiffs are unaware of any change in BDA's operations that will eliminate future fecal coliform violations. Upon information and belief, BDA will violate its fecal coliform limits after the date this Complaint is filed.

## COUNT VII

104. Plaintiffs incorporate paragraphs 1 through 103 as if set forth herein in full.

## BDA'S BIOCHEMICAL OXYGEN DEMAND, CHEMICAL OXYGEN DEMAND, AND TOTAL SUSPENDED SOLIDS VIOLATIONS

105. BDA's RIPDES permit contains limits on biochemical oxygen demand ("BOD") and chemical oxygen demand ("COD"), which are measures of the oxygen-consuming capacity of pollutants in wastewater. BOD measures the oxygen-consuming capacity of organic matter, while COD measures the oxygen-consuming capacity of both organic and inorganic matter.

106. High levels of BOD and COD can reduce the dissolved oxygen content of the water body into which wastewater is discharged. Fish and other aquatic organisms depend on dissolved oxygen to breathe. Effects of low dissolved oxygen on aquatic organisms can include stress-induced disruption of feeding and reproductive habits and, in extreme cases, suffocation and death.

107. BDA's RIPDES permit also contains limits on total suspended solids ("TSS"). TSS is a measure of solid matter suspended, but not dissolved, in wastewater.

108. High levels of TSS can harm fish by blocking their gills and inhibiting growth and reproduction. Increased TSS can also reduce light penetration in the water body into which wastewater is discharged, potentially slowing plant growth by inhibiting

photosynthesis and leading to reduced food for aquatic life and reduced levels of dissolved oxygen. In addition, the suspended solid matter can settle to the bottom of a river bed, smothering fish and insect eggs.

109. Because BOD, COD, and TSS are all related to the presence of solids in industrial wastewater, discharges in excess of each of these parameters often are linked to the same deficiencies in wastewater treatment.

110. According to DEM, two possible reasons why BOD, COD, and TSS violations occur at BDA are that cold weather can reduce the effectiveness of BDA's wastewater treatment system in breaking down organic matter, and that stormwater contributions to the wastewater treatment system can overload the system.

111. BDA's RIPDES permit contains tiered effluent limits for BOD, COD, and TSS that vary based on the production rate of the plant each month (as measured by pounds of cloth per discharge day). The permit limits the total number of pounds of BOD, COD, and TSS, respectively, that can be discharged in any one day (a "daily maximum" limit) and as a per day average over the course of each month (a "monthly average" limit). Beginning on January 1, 2002, BDA's RIPDES permit set maximum limits for BOD, COD, and TSS as follows (all values are in pounds per day):

| Production | BOD Limits | | COD Limits | | TSS Limits | |
|---|---|---|---|---|---|---|
| Rate | Mo. Avg. | Daily Max. | Mo. Avg. | Daily Max. | Mo. Avg. | Daily Max. |
| 40,000 | 132 | 264 | 2,068 | 3,200 | 340 | 440 |
| 60,000 | 198 | 396 | 3,102 | 4,800 | 510 | 660 |
| 80,000 | 264 | 528 | 4,136 | 6,400 | 680 | 800 |
| 100,000 | 330 | 660 | 5,170 | 8,000 | 850 | 1,100 |
| 120,000 | 396 | 792 | 6,204 | 9,600 | 1,020 | 1,320 |
| 140,000 | 462 | 924 | 7,238 | 11,200 | 1,190 | 1,540 |

112. Under the RIPDES permit in effect before January 1, 2002, BDA's permit limits for BOD, COD, and TSS were:

| Production | BOD Limits (lbs/day) | | COD Limits (lbs/day) | | TSS Limits (mg/l) | |
|---|---|---|---|---|---|---|
| Rate | Mo. Avg. | Daily Max. | Mo. Avg. | Daily Max. | Mo. Avg. | Daily Max. |
| 60,000 | 198 | 396 | 3,102 | 4,800 | 510 | 660 |
| 80,000 | 264 | 528 | 4,136 | 6,400 | 680 | 880 |
| 100,000 | 330 | 660 | 5,170 | 8,000 | 850 | 1,100 |
| 120,000 | 396 | 792 | 6,204 | 9,600 | 1,020 | 1,320 |
| 140,000 | 462 | 924 | 7,238 | 11,200 | 1,190 | 1,540 |

113. Over the past five years, BDA has repeatedly violated the applicable permit limits (based on production rate) for BOD, for COD, and for TSS. Each time BDA exceeds its BOD, COD, and TSS limits, it violates the CWA.

114. Plaintiffs are unaware of any change in BDA's operations that will eliminate future BOD, COD, or TSS violations. Upon information and belief, BDA will violate its BOD, COD, and TSS limits after the date this Complaint is filed.

**COUNT VIII**

115. Plaintiffs incorporate paragraphs 1 through 114 as if set forth herein in full.

**BDA'S pH VIOLATIONS**

116. The pH scale measures the acidity and alkalinity of water and other substances. At the center of the scale, which runs from zero to fourteen "standard units" ("SU"), is a pH of 7 SU, which is considered neutral (i.e., neither alkaline nor acidic). Numbers above seven represent greater alkalinity, while numbers below seven represent greater acidity. The scale is logarithmic, meaning that water with a pH of 9 is ten times more alkaline than water with a pH of 8, and water with a pH of 10 is one hundred times more alkaline than water with a pH of 8. The natural pH of most freshwater rivers is in the range of 6 to 8.

117. When fresh water becomes highly alkaline it can cause fish to lose their protective slime coating, cause damage to external organs such as eyes and gills, and interfere with their ability to dispose of metabolic wastes.

118. BDA's RIPDES permit prohibits BDA's effluent from a having a pH less than 6.0 SU or greater than 9.0 SU.

119. On a number of occasions during the five years preceding the Notice Letter, BDA's wastewater had a pH that exceeded 9.0. Each time BDA's wastewater exceeds the pH limit of 9.0, BDA violates the CWA.

120. Plaintiffs are unaware of any change in BDA's operations that will eliminate future pH violations. Upon information and belief, BDA will violate its pH limits after the date this Complaint is filed.

## COUNT IX

121. Plaintiffs incorporate paragraphs 1 through 120 as if set forth herein in full.

## BDA'S SURFACTANT VIOLATIONS

122. BDA's RIPDES permit contains limits on surfactants. Surfactants are chemicals contained in detergents that reduce the surface tension of water, allowing the detergent to more easily penetrate the material being washed. The amount of surfactants in water is determined by measuring the levels of methylene-blue-active substances ("MBAS").

123. Because surfactants alter surface tension, they can destroy natural water-repellent oil layers on animals, harm aquatic plants through alteration of surface tissues, and affect the way fish gills operate. At low levels surfactants can interfere with the basic chemistry of aquatic life, and at high levels surfactants can be lethal to fish.

Surfactants can interact with other chemicals present in a body of water, causing aquatic organisms to be more vulnerable to toxic pollutants such as petroleum products, pesticides, chloramines, heavy metals and metal ions.

124. BDA's RIPDES permit contains tiered effluent limits for surfactants that vary based on the production rate of the plant each month (as measured by pounds of cloth per discharge day). The permit limits the total number of pounds of surfactants that can be discharged in any one day (a "daily maximum" limit) and as a per day average over the course of each month (a "monthly average" limit). Beginning on January 1, 2002, BDA's RIPDES permit set maximum limits for discharges of surfactants as follows (all values are in pounds per day):

| | Surfactants (MBAS) | |
|---|---|---|
| Production Rate | Monthly Average | Daily Maximum |
| 40,000 | 2.88 | 2.88 |
| 60,000 | 4.32 | 4.32 |
| 80,000 | 5.76 | 5.76 |
| 100,000 | 7.20 | 7.20 |
| 120,000 | 8.64 | 8.64 |
| 140,000 | 10.08 | 10.08 |

125. Under the RIPDES permit in effect before January 1, 2002, BDA's permit limits for surfactants were:

| | Surfactants (MBAS) | |
|---|---|---|
| Production Rate | Monthly Average | Daily Maximum |
| 60,000 | 4.3 | 4.3 |
| 80,000 | 5.8 | 5.8 |
| 100,000 | 7.2 | 7.2 |
| 120,000 | 8.6 | 8.6 |
| 140,000 | 10.0 | 10.0 |

126. Over the past five years, BDA has repeatedly violated its applicable permit limits (based on production rate) for surfactants (MBAS). Each time BDA exceeded its permit limits for surfactants, BDA violated the CWA.

127. Plaintiffs are unaware of any change in BDA's operations that will eliminate future surfactant violations. Upon information and belief, BDA will violate its surfactant limits after the date this Complaint is filed.

**AS TO COUNTS IV THROUGH IX, INCLUSIVE, MEMBERS OF THE PLAINTIFF GROUPS ARE HARMED BY BDA'S CLEAN WATER ACT VIOLATIONS**

128. Over the years, Plaintiff Group members and their families have boated on, swum or waded in, hiked or walked along, or fished in the Pawcatuck River downstream of the location of BDA's wastewater outfall.

129. Members of each of the Plaintiff Groups consider a clean and vibrant river to be an important natural resource and an aesthetically pleasing part of the area in which they live.

130. Members of each of the Plaintiff Groups are concerned about the pollutants discharged into the river from the BDA plant, and any illegal pollutant discharges in particular, and as a result have curtailed their use of the Pawcatuck River downstream of BDA.

131. Members of each of the Plaintiff Groups are concerned that BDA's Clean Water Act violations pose a threat to public health and to aquatic and non-aquatic life in and around the Pawcatuck River.

132. When Plaintiff Group members do observe the Pawcatuck River, or use the river or the land surrounding it for recreation, their enjoyment of it is diminished by the

pollution from BDA and by their knowledge of BDA's illegal pollutant discharges into the river.

**RELIEF REQUESTED AS TO COUNTS I THROUGH IX, INCLUSIVE**

Plaintiffs request that this Court grant the following relief:

1. Declare BDA to have violated and to be in continuing violation of the CAA;
2. Issue an injunction ordering BDA to stop operating its plant in violation of the CAA;
3. Order BDA to remediate the harm caused by its CAA violations, to the extent possible;
4. Order BDA to pay civil penalties for each violation of the CAA occurring on and after June 20, 2000, in an appropriate amount, as provided by 42 U.S.C. §§ 7413(e) and 7604(a) and (g);
5. Order BDA to pay reasonable attorneys fees and costs (including expert witness fees), as provided by 42 U.S.C. § 7604(d);
6. Declare BDA to have violated and to be in continuing violation of the CWA;
7. Issue an injunction ordering BDA to stop operating its plant in violation of the CWA;
8. Order BDA to remediate the harm caused by its CWA violations, to the extent possible;
9. Order BDA to pay civil penalties for each violation of the Clean Water Act occurring on and after June 20, 2000, in an appropriate amount, as provided by 33 U.S.C. §§ 1319(d) and 1365(a);

10. Order BDA to pay reasonable attorneys fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d); and

11. Provide such other and further relief as may be just and proper.

Dated: August 24, 2005

Rhode Island Public Interest Research Group, Toxics Action Center, and Sierra Club, by their attorneys

Kevin J. McAllister, #2641
Brennan, Recupero, Cascione, Scungio & McAllister, LLP
362 Broadway
Providence, Rhode Island 02909
(401) 453-2300 (phone)
(401) 453-2345 (fax)

David A. Nicholas
(pro hac vice application to be filed)
20 Whitney Road
Newton, Massachusetts 02460
(617) 964-1548 (phone)
(617) 663-6233 (fax)

Joshua R. Kratka
(pro hac vice application to be filed)
National Environmental Law Center
44 Winter Street, 4th Floor
Boston, Massachusetts 02108
(617) 747-4333 (phone)
(617) 292-8057 (fax)